PAUL BUEHNER AND IRENE BUEHNER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6757-73.    Filed January 19, 1976.

*Alonzo W. Watson, Jr.,* and *Gerald T. Snow,* for the petitioners.
*Joyce Elaine Britt,* for the respondent.

734

OPINION

The case at bar requires us to consider the tax consequences flowing from the events that occurred between petitioner, OBC, the pension trust, and the CR trusts. Specifically, we must determine whether the income realized by the CR trusts on the transfers of its assets to the pension trust is attributable and taxable to the petitioner, and whether the petitioner is entitled to charitable contribution deductions for the contribution of these assets to the CR trusts.

Respondent's first argument is that the CR trusts were not independent entities, but rather were devices used by the petitioner to accomplish goals other than those formally stated. He points to petitioner's constant position of authority and control over the entities involved, an alleged inconsistent manner (i.e., inconsistent with the asserted charitable purposes of the CR trusts) in which the transactions occurred, and the noncharitable benefits that accrued to OBC and the pension trust. Respondent believes that, when viewed in its entirety, the creation of the CR trusts must fail for lack of economic reality and charitable purpose.

We have been presented with four duly executed trust documents. Respondent does not question their validity under State law. However, as this Court said in *Irvine K. Furman*, 45 T.C. 360, 364 (1966), affd. per curiam 381 F. 2d 22 (5th Cir. 1967):

A finding of validity under State law, however, does not mean that the trust will necessarily be recognized for tax purposes. It cannot be gainsaid that a taxpayer has "the legal right * * * to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." See *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). While this may be doctrine, it is not dogma and certainly it does not confer a license to substitute form for substance. As has recently been stated: "It is always open to the Commissioner to assess deficiencies on the ground that regardless of regularity of form as a matter of plutological reality, there was no substantial change in economic ownership." *Burde v. Commissioner*, 352 F. 2d 995 (C.A. 2, 1965).

In *Furman* the ultimate conclusion was "not premised upon the retention of dominion and control over the trust by [the taxpayer], but on the absence of economic reality." *Irvine K. Furman*, 45 T.C. at 366.

The four irrevocable CR trusts were established by petitioner between 1962 and 1965. In each petitioner and Irene were named

as trustees, a life income interest in the trust corpus was reserved for them, and upon the death of the survivor the remainder was to be distributed to either the foundation or the LDS Church. The stated purpose of each of these CR trusts is to provide for charitable contributions for the remaindermen who at all times relevant herein were charitable organizations qualifying for deductible contributions under section 170.

In the case at bar although petitioner, as trustee, retained control over the corpus we believe that he effectively relinquished the remainder interest in the contributed property. It seems clear that these interests were irrevocably committed to the charitable remaindermen. One of the remaindermen, the LDS Church, was notified of some of the transfers to the CR trusts and did receive copies of the trust instruments. We believe these circumstances indicate that the CR trusts were independent entities created for a valid charitable purpose and cannot be ignored. See *Alden B. Oakes,* 44 T.C. 524, 530 (1965).

Respondent argues that the manner in which petitioner, who was in control in varying capacities of the entities involved, conducted the questioned transactions clearly shows that the CR trusts were not created for their stated charitable purpose. He points mainly to the fact that the CR trusts accepted the unsecured notes of OBC in violation of the CR trusts' terms.

Administrative irregularities committed by the trustee do not necessarily mean that the trusts do not have substance. We believe that the CR trusts were valid when they were created and that they effectively conveyed the remainder interest in the corpus to the charitable remaindermen. Petitioner, as trustee, might well have been liable to the beneficiaries of the CR trusts if such irregularities impaired their interests, but it does not follow that such activity causes the petitioner as grantor of the CR trusts to be taxed on the income of the CR trusts. *Hamiel's Estate v. Commissioner,* 253 F. 2d 787 (6th Cir. 1958), remanding a Memorandum Opinion of this Court.

In *Litta Matthaei,* 4 T.C. 1132, 1139 (1945), this Court said with respect to this point:

While it may have been violative of the grantors' fiduciary obligations, if not of the laws of the State of Michigan regulating the administration of trusts, for the trustees to commingle the trust funds with their personal funds as they did prior to the establishment of the trust accounts, and on occasions to borrow or appropriate trust funds for their own use, it does not follow that the trusts were

without substance. The final accounting of the trust funds after the death of Emma in 1943 found the trust funds all intact. The actual accretions to the original corpora of the trusts in the form of dividends and interest were readily ascertainable and all of such income has been accounted for in the trust portfolios and bank accounts.

Although, as of the time of trial, a final accounting had not been necessary, we do note that the unsecured notes were later replaced with notes secured by adequate collateral, and that during the years in issue appropriate records were kept and corresponding tax returns were filed reflecting the various interests in the CR trusts.

Respondent also argues that the true nature and purpose of the CR trusts are revealed when the benefits that accrued to OBC and the pension trust are considered. In this light respondent's position is that the CR trusts were created for tax-avoidance purposes and have no independent significance of their own. With respect to this question we are faced with the seemingly conflicting interpretations of *Gregory v. Helvering,* 293 U.S. 465 (1935), and other cases. See *Irvine K. Furman,* 45 T.C. at 364; *Alden B. Oakes, supra* at 532.

In *Estelle Morris Trusts,* 51 T.C. 20 (1968), affd. 427 F. 2d 1361 (9th Cir. 1970), this Court found that 20 trusts established by two documents were created primarily for tax-avoidance (income-splitting) purposes, but that this finding was not enough to invalidate the multiple trusts. This conclusion was in part based on "the realization that the Internal Revenue Code, by recognizing even one trust for tax purposes, sanctions to some degree income splitting and the resulting lessening of taxes," *Estelle Morris Trusts,* 51 T.C. at 39.

The CR trusts, then, as recognized entities for tax purposes are certainly able to enter into transactions with other entities. The fact that tax advantages accrue from these transactions should have no effect on the viability (for tax purposes) of the CR trusts. Nor do we believe that the respondent's position, in this regard, is enhanced by emphasizing the petitioner's position with respect to the CR trusts and the other entities involved. As a cotrustee he was subject to the responsibilities and duties imposed by that relationship and there is no indication that the interests of the income or remainder beneficiaries were ever impaired. *S. C. Johnson & Son, Inc.,* 63 T.C. 778, 789 (1975), on appeal (7th Cir.

Oct. 28, 1975); *Daniel D. Palmer,* 62 T.C. 684, 693-694 (1974), affd. on another issue 523 F. 2d 1309 (8th Cir. 1975).

Throughout this phase of his argument the respondent has attacked the validity of the CR trusts by relying on the petitioner's position with respect to the entities involved and the alleged improprieties that characterized the questioned transactions. As we have discussed we do not believe that these points affect the validity of the CR trusts. Such factors, however, may bring the CR trusts within the provisions of sections 671 through 677 and cause the petitioner to be liable for the income earned by the CR trusts. These considerations and others will be more fully discussed *infra.*

In the event that we were to uphold the validity of the CR trusts, respondent argues in the alternative that the transfers of property to, and the subsequent sales by, the CR-2, CR-3, and CR-4 trusts were prearranged by petitioner and as such represent sales by him in his individual capacity. Respondent points to the position of authority and control that the petitioner maintained with respect to the entities involved and the short period of time the CR trusts held the property contributed to them.

In *Humacid Co.,* 42 T.C. 894 (1964), the promissory notes of a corporation were contributed by the taxpayer, who held the notes and controlled the corporation, to a charitable organization. When these notes were contributed, on December 2, 1958, it was contemplated that they would be redeemed by the corporation. The redemption occurred on December 24, 1958.

Respondent argued that the charitable organization served merely as a conduit for the collection of income that belonged to the taxpayer. In denying the respondent's position with respect to this issue, the Court found that the taxpayer had on December 2, 1958, given up all right, title, and interest in these notes.

The Court went on to hold in *Humacid Co., supra* at 913, that:

The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale.

The fact that notes were held by the charitable organization for only a short period and that the petitioner controlled the redeeming corporation did not affect the result. The Court also noted that despite the fact that the redemption was contemplated, there was no evidence that it had been prearranged.

In *DeWitt v. United States,* 204 Ct. Cl. 274, 298-299 (1974), the court said:

The Commissioner of Internal Revenue and the courts have been at odds in gift-and-repurchase situations such as confronts us here. While the Commissioner has emphasized the "prearrangement," "understanding" of the parties and "common identity" of donor and repurchaser aspects relative to gifts of stock, the courts have tended to focus on the narrow circumstances surrounding the actual delivery of the stock. The thrust of decisions involving gift-and-repurchase of stock is that a completed gift takes place when there is donative intent and physical delivery of the stock to the donee—which, without more, implies relinquishment of dominion and control by the donor over such stock. * * * These decisions disclose that courts will attach conclusive substance to the form chosen by the parties unless one can demonstrate rather clearly that the form chosen is not an accurate reflection of its substance. Further, they reveal that courts are generally not concerned with what a donee does with the gift thereafter, even if the gift is repurchased shortly after it is given by the donor's controlled corporation, providing there is no agreement between the donor and donee such as to render the gift a sham, and the donor risks the possibility, however small, that the donee may sell the gift elsewhere. *Prearrangements, understandings or tentative planning between the involved parties which do not impose legal obligations on them to either sell or purchase the gift after it is given, will not invalidate the gift.* [Emphasis added; fn. refs. omitted.]

This statement is representative of the factors considered by courts with respect to this issue and we believe it is applicable to the issue at hand. See *Carrington v. Commissioner,* 476 F. 2d 704 (5th Cir. 1973); *Daniel D. Palmer, supra; Glenn E. Edgar,* 56 T.C. 717 (1971); *Sheppard v. United States,* 361 F. 2d 972 (Ct. Cl. 1966).

We have found that the petitioner made valid gifts of the property to the CR trusts. Although petitioner was in control of the entities involved, the evidence in this record does not appear to be substantially different from the facts considered in the cases cited above. *Daniel D. Palmer, supra* at 689-690, 693-694. Petitioner is certainly free to plan his transactions and he is not obligated to choose an option that produces unfavorable tax results. Respondent's arguments with respect to this issue must be denied.

In the event that we were to find that the CR trusts were neither shams nor conduits used merely for petitioner's purposes, respondent argues that the petitioner should be treated as the owner of the CR-2, CR-3, and CR-4 trusts' corpora pursuant to section 675(3). This section provides that:

SEC. 675. ADMINISTRATIVE POWERS.

The grantor shall be treated as the owner of any portion of a trust in respect of which—

 * * *

 (3) BORROWING OF THE TRUST FUNDS.—The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.

Respondent points out that this provision deals with an event that has occurred and does not require a determination with respect to the petitioner's motives or intent. His position is based on the events that occurred—the sale of the CR trusts' assets and the simultaneous loan of the proceeds to OBC—and the fact that the petitioner was the grantor of the CR trusts and in control of 100 percent of the voting stock of OBC, and that the loans were outstanding during the years in issue.

Although respondent's recitation of the events is accurate we do not agree with the legal conclusion he draws from them. This section prohibits the grantor from directly or indirectly borrowing the corpus or income from the trust. In the instant case funds were borrowed by OBC, not the petitioner-grantor.

OBC is a corporation that has been in active existence for many years. The financial statements provided in the record show it to be a corporation with substantial assets. The respondent has not questioned its status as an active corporation and we do not believe that its existence can be ignored.

The debt in question is reflected by OBC on its financial statements. The funds acquired were used by OBC for internal corporate purposes. There is no indication that any of these funds were indirectly diverted for petitioner's benefit. Certainly, as a shareholder, petitioner received a benefit from this loan but not to any degree greater than the benefit that accrued to the other shareholders, creditors, and employees of OBC.

Respondent has cited the recent case of *Mau v. United States,* 355 F. Supp. 909 (D. Hawaii 1973), in support of his position. In that case the taxpayer-grantor borrowed directly from the trust's funds. We do not believe that it provides adequate precedent which can be applied to the circumstances at hand. Respondent's argument must be denied.

Respondent's next argument is that the petitioner should be treated as the owner of that part of the corpora of the CR-2 and CR-3 trusts that consists of the nonvoting stock of OBC under section 675(4)(B). This section provides:

SEC. 675. ADMINISTRATIVE POWERS.

The grantor shall be treated as the owner of any portion of a trust in respect of which—

* * *

(4) GENERAL POWERS OF ADMINISTRATION.—A power of administration is exercisable in a nonfiduciary capacity by any person without the approval or consent of any person in a fiduciary capacity. For purposes of this paragraph, the term "power of administration" means any one or more of the following powers: * * * (B) a power to control the investment of the trust funds either by directing investments or reinvestments, or by vetoing proposed investments or reinvestments, to the extent that the trust funds consist of stocks or securities of corporations in which the holdings of the grantor and the trust are significant from the viewpoint of voting control * * *

Under the trust instruments all powers with respect to investments of its assets were delegated to the trustees which included the petitioner-grantor. Accordingly under section 1.675-1(b)(4), Income Tax Regs:

If a power is exercisable by a person as trustee, it is presumed that the power is exercisable in a fiduciary capacity primarily in the interests of the beneficiaries. This presumption may be rebutted only by clear and convincing proof that the power is not exercisable primarily in the interests of the beneficiaries. * * *

Respondent argues that this presumption has been rebutted by the fact that the CR trusts made an investment in the form of an unsecured loan, and the course of repetitious conduct clearly indicates that the transactions occurred primarily for the benefit of OBC and not for charitable purposes attributable to the CR trusts.[16]

As provided by the trust instrument the trustees did not have the power to make loans without receiving full and adequate security. Even assuming that such a loan was made and that it represented a breach of the trusts' terms, we believe that it is irrelevant with respect to the application of section 675(4). As we have noted, any possible violation of the trusts' terms could cause the trustees to be liable to the beneficiaries, but since the trustees

[16] Sec. 1.675-1. Administrative powers.

(a) *General rule.* Section 675 provides in effect that the grantor is treated as the owner of any portion of a trust if under the terms of the trust instrument or circumstances attendant on its operation administrative control is exercisable primarily for the benefit of the grantor rather than the beneficiaries of the trust. * * *

did not have this power under the trust instruments we do not believe that section 675(4) is applicable.

Principally, however, we cannot say that the transaction occurred "primarily for the benefit of the grantor" or OBC. The CR trusts received notes from an existing, active corporation. There is no indication that OBC was not able to meet its commitments and in fact interest was paid on these notes. Also, as stated previously, these notes were later secured by adequate collateral. Consequently, we cannot say that the stated charitable purposes of the CR trusts would not be carried out in due course or that the charitable remaindermen were in any way damaged by petitioner's actions.

Respondent next argues that the transfer by petitioner of the 2.06-percent and 12.82-percent limited partnership interests in Hi-Ute to the CR-3 and CR-4 trusts, respectively, did not cause the trusts to become bona fide partners in Hi-Ute pursuant to section 704(e).[17] Petitioner then should be treated as the owner of these interests and taxed upon the gain realized from the sales that occurred in 1966.

Section 704(e)(1) provides:

(e) FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

Under this section we must examine all of the facts and circumstances and determine whether the CR trusts became the true owners of the limited partnership interest. *Adolph K. Krause,* 57 T.C. 890, 896-897 (1972), affd. 497 F. 2d 1109 (6th Cir. 1974); *Ginsberg v. Commissioner,* 502 F. 2d 965 (6th Cir. 1974), affg. a Memorandum Opinion of this Court.

We believe that much of what we said with respect to the validity of the CR trusts is applicable here. Suffice it to say that the remainder interests attributable to these limited partnership interests were effectively conveyed to the CR trusts and irrevocably committed to charitable purposes.

---

[17] Respondent has also determined that petitioner is not entitled to a charitable contribution deduction for the transfer of the 3.33-percent limited partnership interest to the CR-2 trust which has not been sold. This issue will be discussed separately, *infra.*

Under the limited partnership agreement a limited partner had the power to assign his interest. This event did occur, but as we have commented previously, we cannot say that it was done primarily for the petitioner-grantor's benefit or that it harmed the interests of the charitable beneficiaries. All of the appropriate documents affecting the transfer of the limited partnership interests were properly executed. We also note that additional limited partnership interests were subsequently transferred to the CR trusts and that these interests are still being held by the trusts. Secs. 1.704-1(e)(1)(iii) and 1.704-1(e)(2)(i), Income Tax Regs.

Respondent has cited other sections of the regulations which serve as guidelines in making the ultimate decision. Under section 1.704-1(e)(2)(ii), Income Tax Regs., respondent objects to the management powers retained by the petitioner, as trustee, subject to his fiduciary responsibility. The sale of these interests is a reflection of the ability of the trustee to manage the interests contributed to the trusts.

Under section 1.704-1(e)(2)(vii), Income Tax Regs., respondent objects to the lack of participation by the CR trusts in the conduct of Hi-Ute's affairs referring to the fact that these interests were quickly sold. We do not know whether the regulation is intended to require actual participation as distinguished from the right to participate. However, the trusts' ownership of Hi-Ute's interest was established by their quick sale of such interests. We have previously found that these sales were not legally preconceived so that the existence of these powers was a mere sham.

Under section 1.704-1(e)(2)(ix): "The absence of services and participation in management by a donee in a limited partnership is immaterial if the limited partnership meets all the other requirements prescribed in this paragraph." One such requirement is that the limited partnership must be organized under the applicable State limited partnership law. Respondent argues this condition was not met until January 1966 when the certificate of limited partnership was filed.

The filing of this certificate is not a mere formal requirement. In order for the liability of partners to be limited there must be substantial compliance with the statute. However, this does not mean that the partnership relationship has not been created. *Bergeson v. Life Insurance Corp. of America,* 170 F. Supp. 150,

158-159 (D. Utah 1958), modified 265 F. 2d 227 (10th Cir. 1959), cert. denied 360 U.S. 932 (1959). We do not believe this noncompliance affects the issue at hand.

Respondent also attacks the status of Hi-Ute as a limited partnership claiming that it was not formed to carry on business for a profit. Utah Code Ann., sec. 48-1-3 (1953), as amended. He claims that the ranch, Hi-Ute's principal asset, was operated by the petitioner for his personal pleasure.

There is no indication in the record that the petitioner used the property in this manner. The appraisal report does note that the property is near recreation areas, but that was a factor in the assessment of the ranch's fair market value, not an indication of how the petitioner used the property. Furthermore, the record indicates that at the time of trial, negotiations were in progress for the sale of this property at a substantial price. We see no merit in respondent's position.

With respect to this and the preceding issues respondent has strenuously objected to the pervasive control petitioner has had over these transactions and the alleged violation of his fiduciary responsibility as trustee of the CR trusts. There is no doubt that petitioner, wearing a hat suitable to the occasion, was on all sides of every transaction at issue. Such undisputed fact is not of itself fatal to petitioner's case, but it has demanded that we take a hard look at each transaction to insure that it possessed economic reality.

In analyzing the economic reality of these transactions a gut question has been whether petitioner was in every instance accountable to an adverse party or a disinterested authority. We have found that he was.

When acting as a trustee he was responsible to other trustees and to the beneficiaries. When acting as a member of the administrative committee on the pension trust, he was accountable to the other members of the committee and to the beneficiaries of the trust. If acting as majority shareholder, he could be held accountable by the minority shareholders if he operated in derogation of their rights. When performing as chief executive officer, he was responsible to the board of directors and the shareholders. In all these instances petitioner could ultimately be held accountable in the courts for any violation of his fiduciary obligations. *Pepper v. Litton,* 308 U.S. 295 (1939); *Grace v. Grace National Bank of New York,* 465 F. 2d 1068 (1972); *S.C.*

*Johnson & Son, Inc.,* 63 T.C. 778 (1975); *Daniel D. Palmer,* 62 T.C. 684 (1974); *Hansen v. Granite Holding Co.,* 218 P. 2d 274, 117 Utah 530 (1950). These elements of accountability lend assurance to a conclusion that things will remain what they seem to be.

Several different entities have been involved in these transactions—petitioner, the CR trusts, OBC, and the pension trust. Respondent has not questioned the status of the pension trust, and we have found the CR trusts and OBC to be valid entities. We do not believe that petitioner, despite his connection with these entities, is the alter ego of any of them.

It does appear that petitioner planned the transactions that occurred; however, that does not necessarily mean that they were prearranged or that any binding commitments were made. Petitioner is certainly permitted to consider various options before he acts, and he is not obligated to select the method that best suits the respondent. There is also no indication that the consideration paid for the properties involved did not represent fair market value, or that it has not been subsequently respected.

We have said before, even assuming that petitioner violated his fiduciary responsibility as trustee of the CR trusts, that does not mean he is subject to taxation on the income realized. Violation of the CR trusts' terms could cause petitioner, as trustee, to be liable for the consequences of his actions. However, we do not believe that it causes him to be owner of the trusts' corpora.

We have also found that the property contributed was irrevocably committed to charitable purposes. One of the charitable remaindermen was notified of some of the contributions and received copies of the trust instruments. Further, we have found that the transactions were not conducted for petitioner's benefit, nor were they carried out, assuming a breach of petitioner's fiduciary responsibility, in a manner that effectively denied the charitable purposes of the CR trusts.

Consequently, we hold that the CR trusts as valid entities for tax purposes owned the property contributed to them, made the sales in question to the pension trust, and petitioner-grantor did not possess the requisite power over the CR trusts to cause him to be treated as the owner of the CR trusts' corpora. The petitioner then is not to be taxed on the gain realized by the CR trusts on the transactions in question.

During the years in issue petitioner contributed portions of his limited partnership interest in Hi-Ute to the CR trusts. He claimed on his individual tax returns a charitable contribution deduction equal to the value of the remainder interest in these partnership interests. Respondent has disallowed these deductions claiming that the contributions were not real, that the assets transferred were not paid or set aside for charitable purposes, and that if made for charitable purposes the value of the gift was not ascertainable.

With respect to his first position respondent has made basically the same arguments that were advanced previously. We do not believe it necessary to repeat them or our response at this time. We have found the CR trusts to be valid entities and that the property contributed was irrevocably committed to charitable purposes. We believe the transfer of ownership was real and that the subsequent transactions did not alter or affect the intended charitable purposes or the ultimate fruition thereof.

Respondent next argues that the CR trusts were established and administered in a manner that belied their stated charitable purposes. These factors, then, indicate that the contributions were not paid or set aside for the benefit of charity. Respondent does not question the fact that these contributions were made to the CR trusts or that a remainder interest is the subject of the charitable contribution.

The regulations, sec. 1.170-1(e), provide:

(e) *Transfers subject to a condition or a power.* If as of the date of a gift a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible. If an interest passes to or is vested in charity on the date of the gift and the interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable on the date of the gift, the deduction is allowable. The deduction is not allowed in the case of a transfer in trust conveying a present interest in income if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest. * * *

In *United States v. Gates,* 376 F. 2d 65, 75 (10th Cir. 1967), the latter part of these provisions was interpreted to provide a test as to:

whether the assurance of certainty that the Foundation would receive such beneficial interest was such that an ordinarily prudent person possessed of the

same assurance of certainty with respect to a like future event in the ordinary affairs of life and business, would regard the occurrence of such event sufficiently certain to warrant his acting in reliance on its occurrence, and would believe that in so doing he would risk only "the general uncertainty that attends human affairs."

This Court has stated its interpretation in terms of whether the charity is likely to receive the beneficial use of the contribution. *Seymour Seder,* 60 T.C. 49, 53 (1973). These considerations have been applied to remainder interests as well. *James L. Darling,* 43 T.C. 520 (1965).

Respondent relies on *James L. Darling, supra,* citing the Court's reliance on the disregard of the trust's terms and personal benefits derived by the grantor-taxpayer from his use of the trust's assets. We believe, however, that Darling is readily distinguishable.

In that case the taxpayer-grantor transferred property to a trust, but he retained the power in his individual capacity, not as a trustee, to have the trust property sold, to approve the terms of the sale, and to receive the sales proceeds. *James L. Darling, supra* at 534.

Subsequently the trust's terms were amended but the Court concluded:

that there is considerable doubt as to the proper allocation or distribution of profits derived from the sale or exchange of trust assets and as to the value to be ascribed to replaced property for the purpose of valuing the interest to be received in the exchange. Petitioners may have reserved to themselves all increment in value of property contributed to the trust, depending upon how the entire trust agreement is construed. Since petitioners have the sole discretion to determine whether trust property should be sold and the terms of sale, they could at any time direct a sale or exchange of trust assets at a profit to be received by them if in fact the trust reserved to them such gains. The remainder interest under such circumstances can therefore at best remain constant depending upon the action taken by the petitioners, and the remainder interest may never appreciate in value beyond the date of gift valuation. [*James L. Darling, supra* at 536.]

Subsequently the Court found that trust property was exchanged for other property in a manner in which the value of the remainder interest was reduced. This was done despite the trust's terms that provided in the event of an exchange the remainder interest would not be diminished. Based on this transaction the Court concluded that obviously the trust's terms had been

ignored and that the taxpayer-grantor had derived a personal benefit from the use of the trust.

In the instant case petitioner-grantor was also a trustee of the CR trusts and retained the management powers in that capacity. The CR trusts' terms clearly indicate that the capital gains were allocable and attributable to corpus. Further, as frequently observed, we cannot say that the petitioner derived any personal benefit from the transactions that occurred.

In *William D. O'Brien,* 46 T.C. 583, 593 (1966), this Court noted that the grant of broad management powers to the taxpayer-trustee did not necessarily preclude the trust from being organized and operated for charitable purposes. The question to be resolved was whether the power retained by the taxpayer-grantor as trustee was so complete that he could render the remainder interest valueless. In resolving this question in the taxpayer's favor, the Court, in the absence of any showing that the trust terms had been violated, would not assume that they would be violated.

In this case, respondent again points to the violation of the CR trusts' terms that occurred when petitioner, as trustee, accepted the unsecured notes of OBC. However we do not believe that this action, although a technical violation of the terms of the CR trusts, represented a concerted effort to strip the CR trusts of their charitable purposes.

We have found that OBC was an active corporation fully capable of meeting its commitments. We note that interest payments were made on the notes and that subsequently they were replaced with notes that were secured with adequate collateral. There is also an absence of related activity that evidences a conscious intention to disregard the terms of the CR trusts. We cannot say that this action rendered the remainder interest valueless or made it any less likely that the charitable remaindermen would not benefit from these contributions.

Respondent's final argument is that the limited partnership interests did not have an ascertainable value. The parties have agreed that if we should find that these interests had a value in excess of zero then the values used by petitioner are correct. We believe the record clearly indicates these interests had value and respondent in his reply brief agrees that Hi-Ute and its underlying assets had value.

Respondent also argues that the limited partnership interests are not susceptible of valuation considering petitioner's position of control and the failure of Hi-Ute to qualify properly as a limited partnership under Utah law. We do not believe that respondent has raised any matters that have not been discussed previously.

We believe that the transfer of the partnership interests effectively conveyed a remainder interest to the charitable remaindermen, that these interests were set aside for charitable purposes, that the charitable remaindermen were likely to benefit from these contributions, and that these interests had value. Petitioner then is entitled to deduct the value of the remainder interests as determined by reference to the actuarial tables as agreed to by the parties.

In the event that we were to find that petitioner was entitled to a charitable contribution deduction, respondent argues that this deduction is disallowed by section 681(b) as it existed during the years in issue. This section provided in relevant part:

SEC. 681. LIMITATION ON CHARITABLE DEDUCTION.
(b) OPERATIONS OF TRUSTS.—
(1) LIMITATION ON CHARITABLE, ETC. DEDUCTION.—The amount otherwise allowable under section 642(c) as a deduction shall not exceed 20 percent of the taxable income of the trust * * * if the trust has engaged in a prohibited transaction, as defined in paragraph (2).
(2) PROHIBITED TRANSACTIONS.—For purposes of this subsection, the term "prohibited transaction" means any transaction * * * in which any trust while holding income or corpus which has been permanently set aside or is to be used exclusively for charitable or other purposes described in section 642(c)—
(A) lends any part of such income or corpus, without receipt of adequate security and a reasonable rate of interest, to;
* * *
the creator of such trust; * * * or a corporation controlled by any such creator * * * through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.
(3) TAXABLE YEARS AFFECTED.—The amount otherwise allowable under section 642(c) as a deduction shall be limited as provided in paragraph (1) only for taxable years after the taxable year during which the trust is notified by the Secretary that it has engaged in such transaction, unless such trust entered into such prohibited transaction with the purpose of diverting such corpus or income from the purposes described in section 642(c), and such transaction involved a substantial part of such corpus or income.
* * *

(5) Disallowance of certain charitable, etc., deductions.— No gift or bequest for religious, * * * purposes * * * otherwise allowable as a deduction under section 170, 545(b)(2), 642(c), 2055, 2106(a)(2), or 2522, shall be allowed as a deduction if made in trust and, in the taxable year of the trust in which the gift or bequest is made, the deduction allowed the trust under section 642(c) is limited by paragraph (1). With respect to any taxable year of a trust in which such deduction has been so limited by reason of entering into a prohibited transaction with the purpose of diverting such corpus or income from the purposes described in section 642(c), and such transaction involved a substantial part of such income or corpus, and which taxable year is the same, or before the, taxable year of the trust in which such prohibited transaction occurred, such deduction shall be disallowed the donor only if such donor * * * was a party to such prohibited transaction.

Under the terms of section 681(b)(2)(A) it appears that the unsecured loans by the CR trusts represent a prohibited transaction that could affect the deductibility of the contributions made by petitioner to the CR trusts. Petitioner argues that these loans were adequately secured since their maker, OBC, was an existing, active, solvent corporation. However, this Court has held that adequate security means more than the mere promise of the debtor to repay. *Van Products, Inc.,* 40 T.C. 1018, 1024-1025 (1963).

The limitations of section 681(b)(1) are imposed in the taxable year after the trust has been notified of participation in a prohibited transaction unless the transaction was for the purpose of diverting the corpus from charitable purposes and the transaction involved a substantial part of the trust's corpus. Sec. 681(b)(3).

The parties have stipulated that neither the CR trusts nor their respective trustees were ever notified of participation in a prohibited transaction. Respondent argues that such notification was unnecessary to impose the limitations of section 681(b)(1) considering petitioner's level of involvement in the entities connected with the transaction in question. We do not agree with respondent's conclusion.

For the limitations of section 681(b)(1) to be imposed on the CR trusts without their having received such notice, we must determine that the unsecured loans from the CR trusts to OBC were made for the purpose of diverting the CR trusts' corpora from their intended charitable purposes. Although the solvency of OBC may not represent adequate security for its notes in the meaning of section 681(b)(2)(A), that does not necessarily mean

that the unsecured loans evidence the prohibited purpose. We do not believe that this conclusion is inconsistent.

We have found OBC to be an active, solvent corporation capable of meeting its requirements. We have found that adequate consideration was received by the CR trusts and that during the years in issue and after, it has been properly respected. Further the subsequent action by OBC of replacing its notes with those secured by adequate security evidences the opposite intention than that with which we are concerned.

Despite the tax benefits that have accrued to the other entities involved and petitioner's position with respect to them, we do not believe that the terms or the vitality of the CR trusts have been used or abused. We cannot say that the acquisition of OBC's notes made the achievement of its charitable purposes any less likely. Consequently, we do not believe that the prohibited transactions were for "the purpose of diverting such corpus or income from the purposes described in section 642(c)."

From the above determination it follows that the CR trusts are not subject to the limitations imposed by section 681(b)(1). The contributions then by the petitioner are not disallowed by the provisions of section 681(b)(5). Respondent's argument must be denied.

*Decision will be entered for the petitioners.*